# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) REGARDING INSTAGRAM USERNAME RYHN_LURAY | No. 2:23-mc-299-KFW<br><br>**Filed Under Seal** |

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Meta Platforms, Inc. ("Meta"), an internet service provider headquartered in Menlo Park, California, to disclose certain records and other information pertaining to the Instagram account associated with username "rhyn_luray" as active on February 1, 2023, as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

## LEGAL BACKGROUND

1.  Meta is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Meta to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4. On July 26, 2022, Rhyn Bearden ("Bearden") was charged by complaint with one count of conspiracy to distribute and possess with intent to distribute a mixture or substance containing fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), and one count of possession with intent to distribute a mixture or substance containing fentanyl, and aiding abetting such conduct, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2. *United States v. Rhyn Bearden,* Dkt. 1, 2:23-cr-20-JAW.

5. The Affidavit of Drug Enforcement Administration ("DEA") Special Agent Brian Tully submitted in support of the complaint asserted the following facts:

    a. During the mid-morning hours of April 28, 2022, Agent Tully spoke with an anonymous source of information ("SOI") via telephone at the DEA

Portland, Maine Resident Office. In sum and substance, SOI provided the following information:

    i. Gerald Lubio and another male subject named "Rhyn" were about to make a trip to Lawrence, Massachusetts to pick up 50 sticks. Agent Tully knew "sticks" is a term used to describe 10 grams of heroin/fentanyl.

    ii. Lubio will be operating a white KIA.

    iii. John Hansen from Lewiston, Maine orchestrates the drug deal by sending Lubio and Rhyn to meet with a heroin/fentanyl source of supply ("SOS") in Lawrence.

    iv. Typically, Lubio will drop off Rhyn in Lawrence, Massachusetts to meet with the SOS to pick up the drugs. Rhyn will then utilize an UBER to transport the drugs back to Maine where he meets back up Lubio at the Nike store located at the Kittery outlets.

    v. Rubio and Rhyn will then transport the drugs back to Lewiston or Portland to deliver the drugs to Hansen.

    vi. The drugs will be stored within a bag in the back seat and that the bag may have a lock attached.

b. After reviewing records with the Maine Secretary of State confirming that a white Kia was registered to Gerald Lubio, Agent Tully drove to Lubio's home address to conduct surveillance. Agent Tully observed Lubio leave his residence, get into his vehicle, and drive away. At approximately 4:30 p.m., additional surveillance units observed Lubio driving south on I95 in the area of Biddeford. Surveillance units followed Lubio all the way to the

Hampton tolls in New Hampshire. At approximately 7:50 pm., surveillance units observed Lubio driving north on I95 passing through the Hampton tolls. Lubio was observed to be the sole occupant in the vehicle. Surveillance units observed Lubio drive straight to the area of the Kittery outlets.

c. At approximately 8:55 p.m. on April 28, 2022, Sergeant Pappas with the Maine State Police observed Lubio traveling 76 MPH in a 70 MPH zone near mile marker 37 in Saco, Maine. Sergeant Pappas conducted a stop of the vehicle around mile marker 38 of the Maine Turnpike. Trooper Pappas identified Gerald Lubio as the operator and Rhyn Bearden as the passenger seated in the right front seat. Sergeant Flynn arrived shortly after the stop was initiated. Upon speaking with the occupants and explaining the reason for the stop, Sergeant Pappas asked Lubio to exit the vehicle. Sergeant Pappas asked Lubio where his trip started. Lubio stated that he was coming from Boston's Logan Airport having just picked up Bearden.

d. Sergeant Flynn informed Sergeant Pappas that he had observed through the window of the vehicle in plain view a "cooking tin" on the floor of the back seat. Agent Tully knew from his training and experience that cooking tins are small metal bowls that are commonly used to prepare drugs for injection.

e. Sergeant Flynn also observed cotton swabs, which are also used to prepare drugs for injection, located within the vehicle. When asked, Bearden stated that he was coming from Haverhill, Massachusetts where he had visited

his sister. Lubio and Bearden provided conflicting stories regarding their trip.

f.  Sergeant Pappas asked for and received consent from Bearden to search his person. Sergeant Pappas asked if Bearden had any needles on him, and Bearden responded affirmatively. Sergeant Pappas then handcuffed Bearden. Sergeant Pappas then removed several needles from Bearden's pockets.

g.  Sergeant Pappas began a search of the vehicle where he located a backpack. Sergeant Pappas searched the backpack and located approximately 400 grams of heroin/fentanyl concealed in a plastic bag further packaged in 38 individual cylinder-shaped fingers known as "sticks." A TruNarc scan of one of the sticks yielded a presumptive positive result for the presence of fentanyl. Based on his training and experience, Agent Tully stated that this amount of fentanyl packaged in this manner is consistent with an intent to distribute.

h.  Agent Tully subsequently conducted a voluntary post-Miranda interview with Bearden, from which he learned the following:

    i.   He and John Hansen combined money earlier in the day to purchase the drugs which were just seized.

    ii.  He had travelled to Lawrence on more than three occasions to purchase drugs.

    iii. Hansen orchestrates the trips down to Lawrence with the source of supply.

        iv. Lubio picked him up earlier and Lubio was aware they were travelling to Lawrence.

        v. Lubio is not involved in distributing the drugs and only acts as the driver to transport the drugs.

i. Agent Tully also conducted a voluntary interview with Lubio. He explained to Lubio that he was free to leave or stop talking to law enforcement at any point. Lubio acknowledged to Agent Tully that he understood he could leave but instead elected to speak with Agent Tully. Lubio told Agent Tully the following:

        i. He has taken Bearden to Lawrence to pick up drugs on three occasions.

        ii. He drives Bearden to Lawrence and that in Lawrence, Bearden exits Lubio's car and goes to an unknown location.

        iii. After dropping Bearden off, Lubio drives back alone to the Kittery outlets and waits for Bearden to arrive by UBER.

        iv. He is paid $60.00 per trip to transport Bearden to Lawrence.

        v. Lubio has never met John Hansen.

j. After Agent Tully interviewed Bearden and Lubio, two controlled and monitored outgoing calls were placed to Hansen utilizing Lubio's cellular phone. Call 1 was placed at approximately 10:30 p.m., while call 2 was placed at 11:00 p.m. During one of these calls, Hansen asks Bearden "dude did you get the shit?" Bearden responded "of course we did." Hansen admonished Bearden by stating "get back here you have over two thousand dollars-worth of my shit." Later in the call, upon learning that

Bearden and Lubio were stopped by law enforcement but avoided losing the drugs, Hansen states "I was going to beat the shit out of both of you." Hansen then tells Bearden to "go straight to your house I'll be waiting there."

k. Bearden had told Agent Tully Bearden's address in Portland. Shortly after the monitored calls to Hansen, Agent Tully sent surveillance units to that address. At approximately 11:00 p.m., agents established surveillance in the vicinity of the address. A short time later, TFO Dan Donovan alerted surveillance that John Hansen was observed sitting in a silver Toyota Corolla in the back lot. Shortly thereafter, Sergeant Pappas observed Hansen walking up toward Congress Street. Sergeant Pappas arrested Hansen for a state probation violation. Upon arrested, Hansen was given his Miranda warnings, which he waived. In sum and substance, Hansen told Agent Tully the following:

   i. He was aware that Bearden and Lubio made a trip to Lawrence earlier in the day to pick up drugs.

   ii. He had given Bearden between $450.00 and $500.00 earlier in the day to purchase a portion of the drugs in Lawrence.

   iii. Both he and Bearden know the "connection" or source of supply in Lawrence as "Manuel."

   iv. He has combined money with Bearden between seven and ten times in the past to purchase drugs in Lawrence.

   v. He has travelled an additional seven to ten times on his own to purchase drugs in Lawrence.

      vi. He spoke with Manuel earlier and Manuel confirmed he met with Bearden and sent 40 "sticks" (400 grams) of heroin/fentanyl back to Maine with Bearden.

  l. Agent Tully's Affidavit is publicly available. *See United States v. Rhyn Bearden,* Dkt. 1-1, 2:23-cr-20-JAW.

6. Bearden was summonsed to appear on the complaint. *United States v. Rhyn Bearden,* Dkts. 8, 10, 2:23-cr-20-JAW. On August 8, 2022, Bearden made his initial appearance and was ordered release on unsecured bond subject to conditions. *Id.* at Dkt. 26.

7. On March 17, 2023, the government filed an Ex Parte Motion for Issuance of Arrest Warrant, for Revocation of Order Setting Conditions of Release, and for Order Directing the Defendant's Detention. The Court issued a warrant on that same date in *United States v. Rhyn Bearden,* 2:22-mj-123-KFW. The Ex Parte Motion and Warrant remain sealed at this time.

8. On March 22, 2023, the grand jury indicted Bearden on one count of conspiracy to distribute and possess with intent to distribute fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), and one count of possession with intent to distribute fentanyl, and aiding and abetting such conduct, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2. *United States v. Rhyn Bearden*, Dkt. 63, 2:23-cr-20-JAW. The Court issued a warrant for Bearden's arrest on the indictment.

9. Due to the timing of the merger of the "mj" and "cr" docket records, the government understands that there are currently warrants pending for Bearden's arrest in both 2:22-mj-123-KFW and 2:23-cr-20-JAW.

10. To date, Bearden has not been arrested. According to Deputy U.S. Marshal Spencer Christie of the United States Marshals Service, Bearden's precise whereabouts are currently unknown.

11. Deputy U.S. Marshal Christie reports that his investigation reveals that Bearden—who had a passport from the United Kingdom—traveled from Baltimore to London, England on March 5, 2023, with no return flight scheduled.

12. The United States Marshals Service identified the Instagram account associated with username "rhyn_luray" as associated with Bearden. Specifically, investigators observed a publicly available photograph of the account user and determined that it is consistent with a known photograph of Bearden taken during his booking process.

13. Though each username can only be assigned to one user at a time, Instagram users can change their usernames at any time and discarded usernames can be reassigned to other users. Meta therefore requires that legal process include a date on which the target Instagram account was active. Deputy U.S. Marshal Christie reports that he spoke with an individual at Bearden's former employer, who confirmed that he or she was previously friends with Bearden on Instagram, including in February 2023. For that reason, the United States is requesting information regarding the Instagram account associated with username "rhyn_luray" as active on February 1, 2023.

14. Based upon his training and experience, Deputy U.S. Marshal Christie believes that the information described in Attachment A is relevant and material to the ongoing investigation, including efforts to locate Bearden and effectuate his arrest.

   a. For example, subscriber information may identify residential or business addresses associated with Bearden, which would assist agents in physically

locating him. Information regarding email addresses, associated accounts, and telephone and instrument numbers may provide additional avenues of investigation, such as identifying other accounts about which, or other service providers from whom, to request information. Connection records may identify individuals with whom Bearden has regular contact. Session records, temporarily assigned network addresses, and other subscriber numbers or identities may provide necessary information for agents to seek records from service providers about accounts and/or routers assigned particular Internet Protocol ("IP") addresses at given dates and times. Records regarding accounts and/or routers assigned IP addresses may also demonstrate patterns of living that suggest or identify locations frequented by Bearden. Means, source of payment for services, and billing records may assist in identifying physical addresses associated with Bearden and entities—such as banks or credit card companies—that may possess additional records relevant and material to the investigation.

b. Records of user activities may assist in identifying patterns of living, individuals with whom Bearden has regular contact, and IP addresses associated with connections to or from the Instagram account. Similarly, information regarding—but not including the contents of—communications sent to or received by the Account may assist in identifying patterns of living, individuals with whom Bearden has regular contact (including associated email addresses, IP addresses, and/or phone numbers), and IP addresses associated with communications sent from or to the Instagram account. As indicated above, such IP addresses may

provide necessary information for agents to seek records from service providers about accounts and/or routers assigned particular IP addresses at given dates and times.

REQUEST FOR ORDER

15. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States locate Bearden, effectuate his arrest, and bring him before this Court pursuant to lawfully issued warrants. Accordingly, the United States requests that Meta be directed to produce all items described in Part II of Attachment A to the proposed Order.

16. The United States further requests that the Order require Meta not to notify any person, including the subscriber of the account listed in Part I of Attachment A, of the existence of the Order for a period of ninety (90) days from the date of the Order. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id*.

17. In this case, such an order would be appropriate because the requested court order relates to an ongoing criminal investigation, including efforts to locate Bearden and effectuate his arrest. Though Bearden is aware of the federal investigation and case due to his appearance on the complaint and may assume that there are efforts to locate him, Bearden may not know that the United States Marshals Service is actively

seeking his location or steps that the United States Marshals Service is taking to do so. If Bearden is notified of the Court's order to Meta, it will confirm the involvement of the Marshals Service and ongoing steps they are presently taking, giving Bearden an opportunity to continue flight from prosecution and change patterns of behavior, including by modifying or deleting social media and messaging accounts (if he has not already done so). Accordingly, there is reason to believe that notification of the existence of the requested court order will seriously jeopardize the investigation, including by giving Bearden an opportunity to continue flight from prosecution, destroy or tamper with evidence, or change patterns of behavior.

18. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is not fully known to Bearden. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Dated: September 28, 2023

Respectfully submitted,

DARCIE N. MCELWEE
United States Attorney

BY: */s/ Nicholas Heimbach*
Assistant United States Attorney
United States Attorney's Office
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101
(207) 780-3257
Nicholas.heimbach@usdoj.gov

# ATTACHMENT A

## I.  The Account

The Order applies to certain records and information associated with the following Instagram account:

  Username: rhyn_luray

  As active on: February 1, 2023

## II.  Records and Other Information to Be Disclosed

Meta Platforms, Inc. is required to disclose the following records and other information, if available, to the United States for the account or identifier listed in Part I of this Attachment ("Account"), for the time **from March 5, 2023, to the present**, regardless of whether such information is located within or outside of the United States:

  A. The following information about the customer or subscriber of the Account:

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
3. Local and long distance telephone connection records (including records of text messages sent and received);
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
5. All accounts associated by device or machine cookie;
6. Length of service (including start date) and types of service utilized;
7. Telephone or instrument numbers (including MAC addresses);
8. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and
9. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B. All records and other information (**not including the contents of communications**) relating to the Account, including:

1. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses; and

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers).